SUPERIOR COURT 
 
 JERRY ADREY Plaintiff VS. DEPARTMENT OF CORRECTION, et al. Defendants

 
 Docket:
 19-3786-H
 
 
 Dates:
 June 19, 2020
 
 
 Present:
 /s/ Peter B. Krupp Justice of the Superior Court
 
 
 County:
 SUFFOLK ss
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTION FOR JUDGMENT ON PLEADINGS AS SUPPLEMENTED AFTER REMAND 
 
 

             Plaintiff Jerry Adrey filed this certiorari petition under G.L. c. 249, § 4, for review of a decision by the Commissioner of the Department of Correction ("the Commissioner") denying his June 21, 2019 petition for medical parole under G.L. c. 127, § 119A (eff. Apr. 13, 2018)[1]. Finding inconsistencies in the Commissioner's decision, the relevant superintendent's failure to prepare a "medical parole plan" as required by statute, and an apparent failure of the Commissioner to decide a later-filed petition for medical parole, I remanded the matter to the Commissioner for reevaluation on an expedited schedule based on plaintiff's current medical condition and with the benefit of a medical parole plan by the superintendent. On remand, the Commissioner again denied plaintiff medical parole. The case is now before me on plaintiff's motion for judgment on the pleadings, as supplemented after remand.[2] For the following reasons, I allow the motion and enter an appropriate order for prompt compliance.
---------------------------
[1]The Commissioner denied the initial petition before the decision in Buckman v. Commissioner of Correction, 484 Mass. 14 (2020), and before the Covid-19 pandemic.
[2]The supplemental record after remand consists of a letter from Carol A. Mici, Commissioner of the Department of Correction, dated May 15, 2020; a letter from Steven P. Kenneway, Superintendent of MCI-Shirley, dated May 15, 2020; the Wellpath Medical Parole Addendum by Dr. Steven Descoteaux, Statewide Medical Director of Wellpath, and Dr. Maria Angeles, Medical Director at MCI-Shirley, dated May 15, 2020; the Wellpath Medical Parole Addendum by Dr. Descoteaux dated May 7, 2020; the Wellpath Medical Parole Assessment by Cheryl Kurtz, NP and Dr. Descoteaux dated April 29, 2020; and 486 pages of historical medical records, which were not available to plaintiff at the time of his initial petition. But see Committee for Public Counsel Services v. Chief Justice of the Trial Court, 484 Mass. 1029, 1032 (2020) ("All correctional facilities shall accept requests [for medical records] by electronic mail, and shall make copies of medical records immediately available to the incarcerated person upon request, or to the individual's attorney upon request accompanied by signed permission by the incarcerated person."). Defendant has also provided a disc with hours of video recorded in the first part of May 2020 from inside the facility, which the parties describe as showing plaintiff walking a short distance slowly. Defendant concedes the video does not show plaintiff walking up or down stairs or being on the upper tier of his assigned unit.
                                                            -1-
BACKGROUND 
            Plaintiff is almost 71 years old. In 1974, at the age of 25, he was convicted of second degree murder and sentenced in the Essex Superior Court to life in prison with the possibility of parole after 15 years. The Supreme Judicial Court upheld his conviction, Commonwealth v. Adrey, 376 Mass. 747 (1978), and affirmed the denial of his new trial motion. Commonwealth  v. Adrey, 391 Mass. 751 (1986).
            After serving more than 17 years, plaintiff was paroled on November 13, 1990. He lived in the community for almost 17 years. Although the record indicates he had some violations while on parole, each time he remained on parole despite his problem with drug addiction.
            On April 17, 2007, plaintiff was re-incarcerated at the age 57 after he was arrested for drug distribution, and found in possession of a .357 Taurus revolver, two types of ammunition, heroin, and amphetamine. A suppression motion was allowed and all charges against plaintiff were nolle prossed in May 2008. Plaintiff nonetheless has remained in custody for the last 13 years following revocation of his parole. According to the Parole Board, after plaintiff was initially re-incarcerated, he received a number of disciplinary reports. In 2013, the Parole Board denied plaintiff parole, with plaintiff eligible for review in five years.
                                                            -2-
            In 2019, plaintiff was housed at MCI-Shirley. On or about June 21, 2019, plaintiff petitioned for medical parole under G.L. c. 127, § 119A, a statute that had taken effect only a year before. Plaintiff's petition and cover letter indicated that plaintiff "is wheelchair-bound[,] suffers from Hepatitis C, . . . [and] requires nursing home care." Plaintiff proposed "as his medical parole plan that he be released to the first available nursing home bed following a grant of release, and that his medical care will then be provided through his nursing home, to be funded by Medicaid."
            On July 15, 2019, Colette Goguen, then the Superintendent at MCI-Shirley ("the Superintendent"), responded to the petition by letter to the Commissioner recommending denial of medical parole. The Superintendent indicated that "[c]urrent information indicates that Mr. Adrey resides safely in general population, is independently ambulatory, and does not require assistance with daily living activities." Relying on an "updated medical evaluation" from Dr. Maria Angeles, the medical director at MCI-Shirley,[3] the Superintendent stated: "I do not find that Mr. Adrey meets the standard required by G.L. c. 127, § 119A(a) of permanent incapacitation 'such that if the prisoner is released the prisoner will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society.'" The Superintendent also found plaintiff does not have a "terminal illness." The Superintendent did not reference plaintiff's medical records, did not prepare or include a "medical parole plan" for plaintiff, and did not explicitly provide an assessment of the risk for violence that plaintiff poses to society.
---------------------------
[3]Dr. Angeles described plaintiff's pertinent medical history as cirrhosis, esophageal varices, history of chronic hepatitis C infection, history of gallstones, and chronic abdominal pain. She indicated that plaintiff "ambulates independently," is independent with activities of daily living, and resides in general population.
                                                            -3-
            On August 29, 2019, the Commissioner denied plaintiff's medical parole petition in accordance with the Superintendent's recommendation. The Commissioner characterized the Superintendent's letter as containing "an updated medical assessment and an evaluation of the risk of violence plaintiff poses to society."[4] The Commissioner also indicated she reviewed plaintiff's April 1, 2019 classification report,[5] personalized program plan,[6] and the Parole Board's decisions in 2008 and in 2013, but noted that plaintiff "did not submit medical records in support of the petition" and found the "medical parole plan" that plaintiff proposed to be "insufficient." But see Buckman v. Commissioner of Correction, 484 Mass. 14, 17, 24-25 (2020) (superintendent must prepare medial parole plan).
            On December 4, 2019, plaintiff filed this action for certiorari review. Plaintiff argued that he was denied medical parole solely because of the nature of his offense of conviction and because of his prior addiction, which has been managed over the last several years due to methadone prescribed for pain management. Plaintiff argues denial of his petition was an abuse of discretion, was not supported by substantial evidence, and an error of law.
---------------------------
[4]The Superintendent's letter does not contain any express assessment of the risk of violence, if any, plaintiff poses in society.
[5]Plaintiff's April 1, 2019 classification report reflects that plaintiff had no convictions in the last four years, no history of attempts to escape, no history of institutional violence in the last four years, no disciplinary reports in the last 12 months, and no discipline in the last 18 months, A.R. 39; and that plaintiff was classified to a minimum security facility "or below," but was held at a medium security facility only because of the nature of his offense of conviction. A.R. 40. Plaintiff's only disciplinary report in the last seven years was in December 2016 for use of obscene, abusive or insolent language or gesture. A.R. 45.
[6]Under a tab marked "Risk Assessment," the record contains a "Personalized Program Plan," which appears to have been printed on June 27, 2019. A.R. 54. I cannot tell when it was prepared, but it reflects plaintiff's program participation through April 10, 2019. Id. The only risk factor identified is substance abuse. A.R. 54-55. The Personal Program Plan indicates that anger, cognitive behavior, criminal thinking, and sex offending are "[n]ot considered a need area for this offender." A.R. 54. Nothing in the "Personal Program Plan" purports to assess plaintiff's risk of violence if released to the community.
                                                            -4-
            After hearing, in early May I remanded the matter to the Commissioner to reconsider her decision based on plaintiff's current medical condition and entire medical record, and after preparation by the Superintendent of a medical parole plan for plaintiff, as required by Buckman. See Order for Remand on Expedited Schedule (May 5, 2020).
            On May 15, 2020, the Superintendent of MCI-Shirley again recommended denial of medical parole and the Commissioner agreed. The Commissioner found that lallthough Mr. Adrey's medical condition appears to have deteriorated to a degree from the date of my previous decision on August 29, 2019, 1 do not find him to be terminally ill or permanently incapacitated  as defined in G.L. c. 127, §119A(a)." (Emphasis added).
            The Commissioner quoted from three medical professionals. The information quoted by the Commissioner is set out in the text chronologically in the following three paragraphs. Additional relevant information from the medical professionals, but not addressed in the Commissioner's letter, is included in footnotes 7, 8, and 10.
            First, according to the Commissioner, Nurse Practitioner Cheryl Kurtz conducted an updated medical evaluation of plaintiff on April 29, 2020, describing plaintiff's condition as follows:
Mr. Adrey has a history of hepatitis C, liver cirrhosis, splenomegaly, abdominal distention and ascites, esophageal varices, lower extremity edema, and chronic pain. . . . Mr. Adrey has medical restrictions for bottom bunk and first-tier housing, uses a wheelchair, has an unstated gait, and is a fall risk.[7]
N.P. Kurtz "concluded that Mr. Adrey 'does not meet the definition of permanent and total  incapacitation.' (Emphasis added).
---------------------------
[7]The April 29, 2020 Medical Parole Assessment, bears the names of both N.P. Kurtz and Dr. Descoteaux. The assessment states further that plaintiff's "chronic abdominal pain and pain in lower extremities limits his mobility."
                                                            -5-
            The Commissioner states that on May 7, 2020, Dr. Descoteaux wrote in his updated medical evaluation that "Mr. Adrey has advanced liver disease and 'may decompensate rapidly within the coming 12-18 months.' . . . Mr. Adrey can conduct activities of daily living ("ADL") independently, can walk 25- 50 feet, and can propel himself short distances in his wheelchair."[8] According to the Commissioner, "Dr. Descoteaux described Mr. Adrey as having some degree of incapacitation but 'for a person to be described as permanently incapacitated, the usual level of function is very low: bed bound, unable to dress or feed themselves, and totally dependent on others.'"[9]
            The Commissioner states that on May 15, 2020, Drs. Descoteaux and Angeles concluded that "while Mr. Adrey's liver disease is progressing, he is not likely to die within the next 18 months." In their joint updated medical evaluation, Drs. Descoteaux and Angeles "described that
---------------------------
[8]Dr. Descoteaux's Medical Parole Addendum dated May 7, 2020 states: "Mr. Adrey has advanced liver disease and this condition is terminal. Though he has been managed with procedures to remove fluid from his abdomen intermittently, he may decompensate rapidly within the coming 12-18 months. Mr. Adrey is able to perform the most basic aspects of self-care including dressing, bathing, and feeding himself. He is however, unable to walk distances  further than 25-50 feet and for that reason he uses a wheelchair. He has a person in his housing unit who pushes his wheelchair for him. Due to upper extremity weakness, he cannot propel  himself in the wheelchair unless he is going very short distances." (Emphasis added). Dr. Descoteaux described Mr. Adrey's level of functioning as follows: "If released to the community, it is conceivable that [Mr. Adrey] could be release[d] to a private home, but he would need to live with a dedicated friend or family member who can provide the assistance he needs to get pushed in his wheelchair, and potentially help them get into and out of a car or van. He does not have nursing needs with respect to medication management, though a home care agency may find him eligible for some basic in-home care. He would need to live on a first floor or in a place with ramps, elevator, or minimal stairs. .. . Mr. Adrey does have a degree of incapacitation that is permanent. As the months wear on, he will become increasingly dependent  on others for assistance." (Emphasis added). Dr. Descoteaux also suggests that Mr. Adrey's methadone prescription "for chronic pain" will have to be maintained and that "[t]here may be an unintended consequence from the methadone that diminishes [Mr. Adrey's] urge to return to opiate abuse and relapse."
[9]This conception is more akin to total incapacitation. It is not the medical parole statute's definition of "permanently incapacitated." See, infra, at 9.
                                                            -6-
Mr. Adrey 'has a degree of incapacitation that requires assistance from someone to push his wheelchair, however, he is not considered totally incapacitated.'" (Emphasis added). The Commissioner does not explain or try to reconcile the significant differences between Dr. Descoteaux's May 7 evaluation and the medical conclusions offered on May 15.[10]
            Based on these medical evaluations, the Superintendent recommended denial of the medical parole petition, concluding that Mr. Adrey "is not statutorily eligible for medical parole" and "resides safely in general population." The Superintendent's evaluation does not contain an assessment of the risk for violence that plaintiff poses to society. In apparent disregard of my remand order, the Superintendent also did not prepare and submit to the Commissioner a "medical parole plan" for plaintiff as required.
            After describing this information provided by the Superintendent, the Commissioner concludes: "Mr. Adrey has some degree of incapacitation but maintains the ability to conduct ADL and retains independent mobility. Further, according to Dr. Descoteaux and Dr. Angeles,
---------------------------
[10]The Medical Parole Addendum by Drs. Descoteaux and Angeles dated May 15, 2020 is largely based on and repeats Dr. Descoteaux's Medical Parole Addendum a week earlier, including its description of plaintiff's condition and level of functioning. See, supra, at 6, n.8. Two parts of Dr. Descoteaux's initial addendum, however, have been watered down or rendered conclusory. First, in his initial addendum, Dr. Descoteaux wrote "Mr. Adrey has advanced liver disease and this condition is terminal. Though he has been managed with procedures to remove fluid from his abdomen intermittently, he may decompensate rapidly within the coming 12-18  months." (Emphasis added). The joint addendum dated May 15, 2020, changes this to state: "Mr. Adrey has advanced liver disease. Though statistics may predict a steadily worsening disease course, Mr. Adrey has done surprisingly well. Though he has been managed with procedures to remove fluid from his abdomen intermittently, he may decompensate rapidly within the coming years." (Emphasis added). Second, Dr. Descoteaux's May 7 addendum states: "Mr. Adrey does have a degree of incapacitation that is permanent. As the months wear on, he will become increasingly dependent on others for assistance." (Emphasis added). A week later, this was changed to: "Mr. Adrey does have a degree of incapacitation, but he does not meet the definition of permanently incapacitated."
                                                            -7-
Mr. Adrey is not likely to die within the next 18 months and is not totally incapacitated."' (Emphasis added). "Accordingly," the Commissioner concludes, "Mr. Adrey's current medical condition does not qualify him for release pursuant to the medical parole statute." The Commissioner does not reference having reviewed, nor does the record reflect, a "medical parole plan" prepared by the Superintendent as required by statute or an assessment of the risk for violence plaintiff poses to society if released.
            On this amended record, plaintiff's motion for certiorari review is before me. Plaintiff argues that on remand the Commissioner and the Superintendent applied the wrong legal standard, failed to comply with the applicable statute in material respects, and that the Commissioner's decision was arbitrary, capricious and an abuse of discretion.
DISCUSSION
            Medical parole is not discretionary. It is not about remorse or the type of rehabilitation that might animate traditional parole. See, e.g., G.L. c. 127, § 130. It is not limited to prisoners who have committed only certain types of offenses. See, e.g., Vazquez v. Superintendent,  Massachusetts Correctional Institution, Norfolk, 484 Mass. 1058, 2020 WL 2791920 at * 1 (May 29, 2020) (rescript) (medical parole granted to prisoner convicted of first-degree murder).
            The medical parole statute requires that a prisoner "shall be released on medical parole" "[i]f the commissioner determines" that the prisoner is "terminally ill or permanently
---------------------------
[11]Drs. Descoteaux and Angeles do not opine that plaintiff "is not likely to die within the next 18 months." Instead, they tiptoe around plaintiff's prognosis, seemingly intentionally giving an outer limit without committing to a likely life expectancy. While Dr. Descoteaux's May 7 evaluation was that plaintiff's "condition is terminal" and "he may decompensate rapidly within the coming 12-18 months," his assessment a week later with MCIShirley's medical director simply stated "he may decompensate rapidly within the coming years." To the extent the Commissioner found that plaintiff was not likely to die in the next 18 months, see A.R. 2, 3, the finding was not supported by the evidence and was arbitrary and capricious.
                                                            -8-
incapacitated such that if the prisoner is released the prisoner will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society." G.L. c. 127, § 119A(e) (emphasis added). The statute defines "[t]erminal illness" as "a condition that appears incurable, as determined by a licensed physician, that will likely cause the death of the prisoner in not more than 18 months and that is so debilitating that the prisoner does not pose a public safety risk." Id. § 119A(a). It defines "[p]ermanent incapacitation" as "a physical or cognitive incapacitation that appears irreversible, as determined by a licensed physician, and that is so debilitating that the prisoner does not pose a public safety risk." Id. The definition of "[p]ermanent incapacitation" does not require "total incapacitation" or the absence of independent functioning, but rather, in relevant part, "a physical . . . incapacitation that appears irreversible" as determined by a physician.
            When a petition for medical parole is filed, the superintendent of the petitioner's facility must review the petition and develop a recommendation for the Commissioner within 21 days. Id. § 119A(c)(1). The superintendent must then transmit to the Commissioner the petition and the superintendent's recommendation together with: "(i) a medical parole plan; (ii) a written diagnosis by a physician licensed to practice medicine . . . ; and (iii) an assessment of the risk for violence that the prisoner poses to society." Id. See Buckman, 484 Mass. at 18. The superintendent is responsible for preparing the medical parole plan, physician's diagnosis, and the risk assessment. Id. at 17, 24-25.
            According to the statute, the "medical parole plan" must include:
a comprehensive written medical and psychosocial care plan specific to a prisoner and including, but not limited to: (i) the proposed course of treatment; (ii) the proposed site for treatment and post-treatment care; (iii) documentation that medical providers qualified to provide the medical services identified in the medical parole plan are prepared to provide such services; and (iv) the
                                                            -9-
financial program in place to cover the cost of the plan for the duration of the medical parole, which shall include eligibility for enrollment in commercial insurance, Medicare or Medicaid or access to other adequate financial resources for the duration of the medical parole.
G.L. c. 127, § 119A(a). In finding the superintendent responsible to prepare the medical parole plan, the SJC wrote in Buckman:
the department [of correction] also has staff who are dedicated to developing individual reentry plans. Each correctional institution has an institutional reentry committee, which includes medical staff and "a medical/mental health discharge planner" who is required to "schedule appointments with [c]ommunity [p]roviders" and to assist prisoners in signing up for MassHealth. . . . [T]o the extent that this obligation may require the allocation of additional reentry resources, the Legislature would have recognized that such a reallocation is well justified economically, given the enormous cost savings that may accrue to the department from the medical release of permanently incapacitated or terminally ill prisoners.
In effect, by enacting § 119A, the Legislature intended to trigger a collaborative process whereby the health care provider for the institution, reentry staff, and the prisoner (or his or her attorney or next of kin) work together to prepare a medical parole plan for the prisoner and obtain a written diagnosis by a licensed physician.[12]
Buckman, 484 Mass. at 28-29 (quoting Department of Correction regulations).[13]
            The decision about whether a prisoner meets the standard for medical parole belongs to the Commissioner, but her decision must be based on certain inputs. For one, the statute requires the input of "a licensed physician" to assess whether the prisoner has (i) an "incurable" condition
---------------------------
[12]In the cover letter accompanying plaintiff's petition, plaintiff's counsel offered "to collaborate" with the Superintendent to develop a suitable medical parole plan. There is no indication that any such collaboration occurred.
[13]Finding them contrary to the statute, Buckman struck down many of the regulations promulgated by the Secretary of the Executive Office of Public Safety and Security to implement the medical parole program set out at 501 C.M.R. § 17.00, et seq. 484 Mass. at 27, 29-30, 33. It does not appear the Secretary has yet promulgated replacement regulations.
                                                            -10-
that "will likely cause . . . death . . . in not more than 18 months"; and/or (ii) "a physical or cognitive incapacitation that appears irreversible." G.L. c. 127, § 119A(a). The Commissioner must then consider a superintendent's "assessment of the risk for violence that the prisoner poses to society," and the "medical parole plan" prepared by or at the direction of the superintendent. Based on these inputs, the Commissioner must determine whether the petitioner's condition is "so debilitating that the prisoner does not pose a public safety risk," id., and that the petitioner, if released, "will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society." If the Commissioner so finds, "the parole board imposes the terms and conditions for medical parole." Buckman, 484 Mass. at 19. See G.L. c. 127, § 119A(e), (f).
            The Superintendent and the Commissioner have twice reviewed plaintiff's petition for medical parole. During the first review, the Superintendent failed to follow the statute in making her recommendation. The Superintendent failed to provide a medical parole plan, and also failed to provide an assessment of the risk of violence plaintiff posed if released in society. In the second review on remand, despite the Court's direction that the Superintendent provide a medical parole plan as required by the statute and as found in Buckman, the Superintendent again failed to provide a medical parole plan. The Superintendent, and then the Commissioner, failed to reconcile or explain the subtle but significant changes in Dr. Descoteaux's medical evaluations, failed to explain why they both preferred the joint evaluation of Dr. Descoteaux and Dr. Angeles, failed to obtain a medical opinion about the irreversibility of plaintiff's condition, and failed to provide or assess plaintiff's risk of violence in the community if released. Notably, none of the medical professionals contradicted the notion that plaintiff's current level of incapacitation was anything other than permanent, and would get worse in the near term. The
                                                            -11-
Superintendent, and then the Commissioner, also applied the wrong legal standard. The Commissioner found that plaintiff was not permanently incapacited because he was not totally incapacitated. This is an incorrect statement of the law.
            There can be no doubt that these failings affected plaintiff's substantive rights. Almost a year has passed since plaintiff first applied for medical parole. The Superintendent's failure to marshal the resources of his reentry staff to prepare a medical parole plan for plaintiff in this time disregards the language of the statute, the holding in Buckman, and this Court's remand order. Plaintiff has advanced liver disease. He is on methadone for pain, which also has the effect of managing his addiction. He is almost 71 years old, suffers from lower extremity edema, chronic pain, and a host of other ailments, which at least one physician indicated would be "terminal." Plaintiff is only able to walk short distances, has an unsteady gait, is a fall risk, and uses a wheelchair. He has limited ability to move the wheelchair himself and requires assistance in moving from place to place, or to travel by vehicle.[14] Had the Commissioner applied the correct legal standard, based on plaintiff's condition, medical parole would have been granted.
            This case is before me on certiorari review under G.L. c. 249, § 4. As the SJC stated in 2017 in City of Revere v. Massachusetts Gaming Commission:
Generally, the standard of review for a certiorari action is calibrated to the nature of the action for which review is sought.. . Ordinarily, where the action being reviewed is a decision made in an adjudicatory proceeding where evidence is presented and due process protections are afforded, a court applies the 'substantial evidence' standard." . . . On the other hand, "where the decision under review was not made in an adjudicatory proceeding," but rather "entails matters committed to or implicating a board's exercise of administrative discretion, the court applies the `arbitrary or capricious' standard."
---------------------------
[14]To call plaintiff in this condition "independently ambulatory" as the Superintendent did in July 2019 borders on misrepresentation by omission.
                                                            -12-
476 Mass. 591, 604-605 (citations omitted). "On certiorari review, the Superior Court's role is to examine the record . . . and to correct substantial errors of law apparent on the record adversely affecting material rights." Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531, 540-541 (2014) (internal quotations omitted), quoting Firearms Records Bureau v. Simkin, 466 Mass. 168, 180 (2013). "In reviewing the decisions of administrative bodies which, like the parole board, are accorded considerable deference, . . . the arbitrary and capricious standard of review applies." Doucette, 86 Mass. App. Ct. at 541 (citations omitted). "A decision is arbitrary or capricious such that it constitutes an abuse of discretion where it 'lacks any rational explanation that reasonable persons might support.' Frawley v. Police Commissioner of Cambridge, 473 Mass. 716, 729 (2016), quoting Doe v. Superintendent of Schools of Stoughton, 437 Mass. 1, 6 (2002). Certiorari relief is warranted where plaintiff shows substantial and material errors that, if allowed to stand, will result in manifest injustice to a petitioner who is without another available remedy. Johnson Products, Inc. v. City Council of Medford, 353 Mass. 540, 541 n.2 (1968).
            Such is the condition for plaintiff here. In the context of medical parole petitions, time is of the essence. The statute places a strict 21-day time limit on a superintendent's collection, preparation, and transmittal of the relevant documents and a recommendation to the Commissioner, G.L. c. 127, § 119A(c)(1), and on the Commissioner's review and decision on the petition. Id. § 119A(e). The Superintendent and the Commissioner have had two opportunities to consider plaintiff's petition. Each time they applied the wrong legal standard and each time they failed to follow the statute's requirement to consider certain factors, including the risk of violence plaintiff presents if released and a medical parole plan that addresses the issues articulated in the statute. Most recently, the Commissioner issued a decision, which was
                                                            -13-
based on a conclusion that plaintiff was not likely to die within the next 18 months, A.R. 3, which was unsupported by the medical evidence provided to the Commissioner; and "is not totally incapacited," id., which is the wrong legal standard. Yet it was on these findings, that the Commissioner denied plaintiff's petition.
ORDER
            Plaintiff's Motion for Judgment on the Pleadings, as amended after remand, is ALLOWED. Plaintiff has demonstrated that he meets the definition of a person who is permanently incapacitated such that if he is released he will live and remain at liberty without violating the law and that release will not be incompatible with the welfare of society. Plaintiff is granted medical parole. The matter is remanded to the Commissioner to transmit plaintiff's file to the Parole Board for it promptly to set such conditions of parole as the Parole Board deems appropriate. The Parole Board should consider placement of plaintiff in a nursing home that will accept MassHealth and where plaintiff can be maintained on his existing methadone treatment regimen and receive other medical care as required. The Court will retain jurisdiction over this matter and will conduct a status conference on July 10, 2020 at 10 a.m. by Zoom to determine if further relief is necessary.
/s/ Peter B. Krupp Justice of the Superior Court
June 19, 2020
                                                            -14-
xxz